**STATE of Minnesota, Respondent,**

v.

**Alex Chico TOVAR, Appellant.**

**No. C6–99–520.**

Supreme Court of Minnesota.

Feb. 17, 2000.

---

Michael C. Davis, Special Assistant State Public Defender, St. Paul, for appellant.

Michael A. Hatch, State Attorney General, St. Paul, Susan Gaertner, Ramsey County Attorney, by Mark Nathan Lystig, Assistant Ramsey County Attorney, St. Paul, for respondent.

## OPINION

GILBERT, Justice.

This matter comes to us as an appeal of right from a conviction of murder in the first degree in Ramsey County District Court. The jury found Alex Chico Tovar (Tovar) guilty of first-degree murder while committing a kidnapping, and other lesser-included offenses, in the January 31, 1998 killing of Joshua James Christenson (Christenson).

On appeal, Tovar raises four issues. Tovar challenges as error the district court's exclusion of out-of-court statements, which were made during failed plea negotiations by an alleged accomplice in the killing. Tovar claims these out-of-court statements were exculpatory. Tovar also claims that the court improperly admitted into evidence a taped police interview with Tovar, in which the police confronted Tovar with statements made by other persons involved in Christenson's kidnapping that inculpated Tovar in Christenson's death. Finally, Tovar challenges the sufficiency of the evidence at trial on the charge of kidnapping and claims that the proof of kidnapping at trial impermissibly varied from the indictment. Because we conclude that the district court was within its discretion

on the evidentiary issues and that Tovar's remaining two claims are without merit, we affirm the judgment of conviction.

On January 31, 1998, Saint Paul Police discovered Christenson's body in the back seat of his car, a maroon Cadillac, which had been abandoned on Jessamine Avenue near Kent Street in Saint Paul. Examination of the body revealed multiple stab wounds, three from a single-edged knife and others from a double-pointed instrument, as well as numerous other cuts and bruises, some of which the medical examiner described as "defense or fending" injuries. There was also packing tape around Christenson's head. The medical examiner also found indications that, at one time, Christenson's entire head and face had been covered with packing tape. Some of the bruising and lacerations were consistent with "impact wounds" probably caused by striking a wall or a sharp table corner. Examination of Christenson's anal area showed bruising and tearing, leading the medical examiner to conclude that he had been sexually assaulted with a blunt object, possibly a stick. The medical examiner determined the cause of death as exsanguination resulting from multiple stab wounds. The lethal wound was a stab wound in Christenson's lower chest area caused by a single-edged knife that cut a vein in his liver. The medical examiner also found cat-litter trapped in Christenson's clothing.

Through interviews with Christenson's girlfriend, as well as other friends and associates, the police quickly ascertained several key facts surrounding Christenson's death. Christenson was a 22–year-old small time drug dealer who, at the time of his death, owed approximately $5500 to Cristobal and Jesus Malave (Malaves) for drugs he had purchased. The Malaves had been looking for Christenson for about a year, but were apparently unaware that Christenson had been arrested approximately a year earlier for possession of methamphetamines and was currently in a court-ordered drug treatment program.

The Malaves told police that they located Christenson on Friday, January 30, 1998, at Alex Tovar's residence at 918 DeSoto Street on the East Side of Saint Paul. The Malaves said that they were driving by in their van when they saw Tovar and Christenson working on Christenson's car. The Malaves told the police that they confronted Christenson about the money he owed them and told him to pay or they would take his car. Christenson instead offered to go out that night and raise the money by dealing drugs. At some point during this conversation, the Malaves, Christenson and Tovar left Tovar's residence and drove to Cristobal Malave's apartment in West Saint Paul. Cristobal Malave drove Christenson's car and Christenson rode in the Malaves' van. The Malaves then continued their discussion with Christenson. Eventually the Malaves agreed to let Christenson try to raise the money, but they sent Tovar along with him to make sure Christenson raised the money or to bring them the car the next day if Christenson did not raise the money.

The police had interviewed Tovar several days before they interviewed the Malaves, but Tovar said nothing about the encounter with the Malaves. Tovar had admitted seeing Christenson on the Wednesday before his death, and that they, along with a friend of Christenson's from treatment, went to the West Side of Saint Paul and purchased marijuana. After they were finished, Christenson dropped Tovar off at his apartment at 918 DeSoto. Tovar and Christenson also arranged to meet on that Friday when Tovar would help Christenson install some sound equipment in his car. Tovar told the police that Christenson had returned on Friday, but that he left after they finished installing the stereo equipment.

Because of the Malaves' statements, the police interviewed Tovar again, this time

confronting him with the Malaves' statements. Tovar confirmed much of what the Malaves told the police. Tovar admitted that he went with the Malaves and Christenson to West Saint Paul after the Malaves arrived at 918 DeSoto. Tovar told the police that he and Christenson had gone to a friend's house to watch a basketball game and that after the game, at around 11:30 p.m. or midnight on Friday, Christenson drove Tovar home. Tovar said that he never saw Christenson alive again and denied any involvement with or any knowledge of Christenson's death. After this interview the police still did not know the specific details of Christenson's death; however, they arrested Tovar and the Malaves for kidnapping.

Approximately 6 weeks later, an anonymous woman called the police claiming to have personal knowledge of events the night of Christenson's death. Because the caller knew certain details of the murder that had not been released to the public, the police were convinced that this person's claims were genuine. The police and the county attorney agreed that it was premature to proceed against Tovar and the Malaves on the kidnapping charges at that time and the county attorney withdrew the kidnapping charges.

The caller contacted the police again in May 1998 and agreed to meet with them. She was then identified by name and was a dancer at the Lamplighter Lounge in Saint Paul. She told the police that she called them because she had seen several of the men involved in Christenson's murder, including Moises Kinney, at the Lamplighter Lounge while she was working. She said that "he look[ed] at [her] funny" and that she was afraid that Kinney might harm her because she knew of his involvement in Christenson's death. The caller and other witnesses the police were now able to identify told the police about a birthday party for her boyfriend, Daniel Thompson, which took place on the night Christenson was killed. They indicated the party occurred at 293 Atwater Street on the North End of Saint Paul. She also told the police that Luis Lebron hosted the party and had been given permission to use the house by Michael Cleveland, the son of the owner of the house. Christenson and Tovar attended the party. Various guests saw Tovar and Christenson arguing. Thompson finally told Tovar and Christenson to "take it outside" and the three of them went out behind the house.

Approximately 45 minutes later, the woman caller saw Tovar and Thompson carry Christenson into the house, his hands bound and face covered with packing tape. They threw Christenson against a wall and then they began to beat and kick Christenson while he lay on the floor. Several other people from the party also began to beat and kick Christenson. Cleveland then saw Christenson thrown down a flight of stairs to the basement, knocking over a container of cat-litter that was at the top of the stairs. Cleveland, who was in the basement at this time, told Thompson to take Christenson out of his house. Cleveland stated that Christenson was alive at this point, but was bleeding and making a "snoring" sound.

Thompson, Lebron, Tovar, and two others, Robert Medina and Moises Kinney, took Christenson out to where Christenson's car was parked. A short time later, Cleveland saw Tovar come into the kitchen and get a knife and go back out to the car. Tovar returned to the house a little while later, sat down and said, "It's done."

Based on this information, police arrested Tovar and several others, including Kinney, for homicide. The police also arrested the Malaves on kidnapping charges. Tovar was charged with aiding and abetting and being aided and abetted by others in first-degree murder while committing a kidnapping; second-degree murder (intentional and unintentional) while committing

a kidnapping; and kidnapping. Tovar's trial was the first trial of all of those charged in Christenson's death. After a week of testimony, the jury found Tovar guilty on all counts of the indictment.

### Kinney's Statement

Tovar made an offer of proof into evidence of portions of a statement made by Kinney during Kinney's plea negotiations relating to Kinney's role in Christenson's death. In this statement Kinney admitted to stabbing Christenson. Subsequently, Kinney's plea negotiations broke down. Kinney, also facing trial for Christenson's murder, refused to testify at Tovar's trial, invoking his rights under the Fifth Amendment. Tovar claimed that Kinney's out-of-court statements were admissible under the statement against interest exception to the hearsay rule contained in Minn. R. Evid. 804(b)(3). The district court reviewed the entire tape of the police interview with Kinney. The district court then ruled that the entire tape was inadmissible as a withdrawn plea agreement under Minn. R. Evid. 410. The court also found that the statements were "inherently unreliable" and that as such were more prejudicial than probative of any issue in this trial. Tovar claims that the court misapplied Rule 804(b)(3), and in doing so denied him the opportunity to present a complete defense.

 We have stated that a "criminal defendant has the right to be treated with fundamental fairness and 'afforded a meaningful opportunity to present a complete defense.'" *State v. Richards*, 495 N.W.2d 187, 191 (Minn.1992) (quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)); *accord* U.S. Const. amend. XIV, § 1; Minn. Const. art. I, § 7. However, criminal defendants must still comply with established rules of evidence designed to assure both fairness and reliability in ascertaining guilt or innocence. *See Cham-*

*bers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); *accord State v. Profit*, 591 N.W.2d 451, 463 (Minn.1999). Thus, even when a defendant alleges that his constitutional rights were violated, evidentiary questions are reviewed for abuse of discretion. *See State v. Gustafson*, 379 N.W.2d 81, 84 (Minn.1985). "The district court is given great latitude in its evidentiary rulings. '[R]ulings on evidentiary matters rest within the sound discretion of the trial court,' and therefore we will only overturn a lower court's evidentiary ruling if that court abused its discretion." *State v. Griller*, 583 N.W.2d 736, 742–43 (Minn. 1998) (alteration in original) (quoting *State v. Olkon*, 299 N.W.2d 89, 101 (Minn. 1980)).

Despite the general rule that hearsay is inadmissible, the "[s]tatement against interest" exception contained in Rule 804(b)(3) allows the admission of certain out-of-court statements against interest, if the declarant is unavailable to testify at trial. *See generally* Minn. R. Evid. 802 and 804. A statement that would tend to expose a declarant to criminal liability and that is offered to exculpate the accused is not admissible unless corroborating "circumstances clearly indicate the trustworthiness of the statement." Minn. R. Evid. 804(b)(3).

The district court reviewed not only the excerpts offered by Tovar, but Kinney's entire interview tape because the court believed that if those excerpts were admitted, the rule of completeness would then allow the state to offer other parts of the statement that "ought in fairness to be considered contemporaneously with [them]." Minn. R. Evid. 106. Tovar's counsel conceded that Rule 106 would likely allow the prosecution to then introduce those parts of Kinney's statement that directly inculpated Tovar in Christenson's murder. Kinney admitted in his statement to stabbing Christenson once in the

stomach. This is one of the key statements that Tovar would like admitted as being exculpatory to Tovar. However, Christenson had been stabbed three times, and just before Kinney inculpated himself, he inculpated Tovar by stating that Tovar stabbed Christenson first. If Tovar was allowed to offer the alleged exculpatory statement, then the district court reasoned that in fairness the inculpatory portions of the statement may have also been allowed into evidence to put Kinney's entire interview in proper context. In doing so, the court would then have to consider issues raised by the Confrontation Clause of the United States Constitution in permitting an out-of-court statement of an unavailable witness that inculpates a criminal defendant. *See generally* U.S. Const. amend. VI; *State v. Ford*, 539 N.W.2d 214, 227 (Minn.1995) (holding that invocation of the Fifth Amendment right against self-incrimination establishes unavailability under Minn. R. Evid. 804(a)).

■ As a general rule, the admission of hearsay evidence by co-defendants not testifying at trial against a criminal defendant will implicate the Confrontation Clause. *See State v. Jones*, 556 N.W.2d 903, 908 (Minn.1996); *see generally* U.S. Const. amend. VI. Though hearsay statements may appear to violate the Confrontation Clause on their face, they nonetheless may be admissible. *See Jones*, 556 N.W.2d at 908.

■ In *Jones*, we determined that the admissibility of "declarations against penal interest" under Rule 804(b)(3) in a criminal trial requires three steps. *See Jones*, 556 N.W.2d at 908. First, the court must determine if the declarant was unavailable to testify at trial. *See id.; see generally* Rule 804(a). Second, the court must determine that the statement must "at the time of its making * * * so far [tend] to subject the declarant to civil or criminal liability * * * that a reasonable person in the declarant's

position would not have made the statement unless believing it to be true." *See Jones*, 556 N.W.2d at 908 (alteration in original) (citing Minn. R. Evid. 804(b)(3)). Third, the court must scrutinize the statements to avoid violating the Confrontation Clause. *See id.* This analysis requires the court to construe the term "statement" narrowly and allow only those statements that directly inculpate the declarant and not admit a larger narrative that merely contains some inculpating statements. *See id.* (discussing *Williamson v. United States*, 512 U.S. 594, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994)). We have adopted the Supreme Court's reasoning in *Williamson* and have used this method to evaluate the admissibility of "declarations against penal interest" in criminal trials. *See, e.g., Ford*, 539 N.W.2d at 227 (holding it was error to admit statements that were non-self-inculpatory but contained within a largely self-inculpatory narrative).

■ In this case, excerpts of Kinney's interview that Tovar desired to introduce generally inculpated Kinney in Christenson's murder. However, when read in context with those portions of the tape that the state could introduce, that Tovar stabbed Christenson first, it inculpates both Tovar and Kinney. Furthermore, Tovar was charged with aiding and abetting. Thus, Kinney's admission relating to his involvement in the stabbing itself, with Tovar's presence and participation, may have inculpated Tovar on that charge. As such, to allow this hearsay statement directly inculpating Tovar in the murder would have implicated Tovar's right to confront witnesses against him.

In light of the aspects of Kinney's statements that inculpated Tovar, the district court had to weigh the relevant rules of evidence and their competing objectives along with the requirements of the Confrontation Clause to determine the admissibility of Kinney's statements. We con-

clude it did so correctly. After reviewing the tape, the district court found that the statements made by Kinney were in furtherance of his own self-interest because they were made in an attempt to obtain a plea bargain and that Kinney appeared to downplay his own involvement in Christenson's murder and exaggerate the involvement of others. The court concluded that the statement was "inherently unreliable, certainly more prejudicial than probative of any facts for which it may be submitted." Accordingly, the district court ruled that Kinney's statements were not admissible by either party.

The court did not use the specific language of Rule 804(b)(3) in determining if "circumstances clearly indicate the trustworthiness of the statement." However, its observations about the statements and finding of inherent unreliability clearly indicate that circumstances of trustworthiness were not present.

The court's finding of inherent unreliability supports its conclusion that the statements were inadmissible under Minn. R. Evid. 403 as well. Rule 403 allows the court to exclude otherwise admissible evidence if its probative value is substantially outweighed by its potential for unfair prejudice, confusion of the issues, misleading the jury or considerations of time. *See* Minn. R. Evid. 403. While perhaps redundant after the court's analysis under Rule 804(b)(3), it is not clear error for the district court to consider Rule 403. Thus, we hold that the district court did not abuse its discretion in excluding the entire statement.

Tovar also claims that the district court misapplied Minn. R. Evid. 410. *See generally id.* (stating that plea agreements, later withdrawn, or any statements made in connection therewith, are inadmissible in any criminal or civil proceeding, whether offered for or against the person who made the plea or offer). Because the court found that the statements were inherently unreliable as well as inadmissible under Rule 403, the statements were properly excluded. Accordingly, we need not reach the issue of the applicability of Rule 410.

*Tovar's Police Interview Tape*

Tovar challenges as error the district court's admission of out-of-court statements by the Malaves that directly inculpated Tovar in Christenson's murder. These statements were recorded in a taped interview conducted with Tovar on February 5, 1998. The tape was played for the jury during the testimony of one of the investigating detectives, Sgt. Bohlig. Because this issue also involves a decision by the district court on the admissibility of evidence, we again review for an abuse of discretion. *See Griller*, 583 N.W.2d at 742–43.

During this interview, the police repeatedly confronted Tovar with the Malaves' statements about the afternoon before Christenson was killed. Tovar admitted being present when the Malaves arrived at 918 DeSoto and to the events at Cristobal Malave's apartment in West Saint Paul. The police informed Tovar that the Malaves had told the police that they had instructed Tovar to "rough up" Christenson if necessary, but that they did not tell Tovar to kill him. The police also said that the Malaves told them that Tovar knew details of the murder that were not publicly known. The police told Tovar that the Malaves were trying to "lay the whole thing off on [him]." Tovar denied any involvement in or any knowledge of Christenson's murder and told the police that Christenson had taken him home at around midnight. Tovar also repeatedly stated that he was Christenson's friend and that he went with Christenson after the meeting with the Malaves to help him keep his car.

Our review of the record indicates no specific objection to the admission at trial

of the tape of Tovar's police interview. At oral arguments before this court, Tovar's counsel admitted as much, but also referred us to Tovar's motion for mistrial at the close of evidence and his motion for a judgment of acquittal. We have also reviewed those motions and again find no specific argument made as to the admission of this tape. There were lengthy hearings by the district court concerning the admission of the Malaves' statements; however, these were all made in the context of their admission through the direct testimony of another testifying police detective, Lt. Reed. Lt. Reed testified to the course of the investigation and relayed the Malaves' statements as they affected the development of the police investigation and the identification of Tovar as a possible suspect. Tovar raised several objections to Lt. Reed's testimony and challenged the Confrontation Clause issues raised by the admission of Lt. Reed's hearsay testimony.

█ The relevant statements made during a police interview may be admissible, unless precluded by the constitution, statute or the rules of evidence. *See, e.g., State v. Nelson,* 257 N.W.2d 356, 359 (Minn.1977); *see also* Minn. R. Evid. 402. We have also held that *"assuming a proper objection,* immaterial and irrelevant portions of an extrajudicial interrogation of a defendant should generally not be received in evidence." *State v. Hjerstrom,* 287 N.W.2d 625, 627 (Minn.1979) (emphasis added). In this case, when the tape was offered into evidence and the court asked Tovar if there were any objections, his counsel replied, "No objection, subject to previously raised legal issues." As we have already observed, there were no "previously raised legal issues" with respect to this tape, nor was there any request by Tovar to redact any portion of this tape.

█ In oral arguments, Tovar stated that the court should have instructed the jury that the statements of the police during the interview were not evidence and should not be considered as substantive evidence. We see no request for such an instruction in the record. We cannot conclude from the record that it was plain error not to give such an instruction. Furthermore, on cross-examination of Sgt. Bohlig, after the tape was played, Tovar's counsel elicited from Sgt. Bohlig several admissions that during interrogations the police regularly "make more" of the evidence that they have to prompt suspects into divulging information. Sgt. Bohlig stated that they would often claim that other persons had told them that the suspect has details about the crime not commonly known. For example, Sgt. Bohlig specifically testified that while he told Tovar that the person in the Taco Bell video looked like Tovar, Sgt. Bohlig had not viewed the videotape at that time. Absent any request for a cautionary instruction, we cannot conclude that one was required in this case. *See, e.g., State v. Holty,* 307 Minn. 478, 479, 238 N.W.2d 615, 617 (1976) (holding that defendant waived error in closing argument when he failed to request cautionary instruction and chose rather to address the improper statement in closing argument).

█ In his brief, Tovar argues that the arguments that he made concerning Lt. Reed's testimony also apply to the statements in the taped interview. However, the same legal issues are not implicated by the admission of the taped interview. Concerning Lt. Reed's testimony, Tovar objected and argued that the Malaves' statements were hearsay admitted under the Rule 804(b)(3) statement against penal interest exception. However, since many of the Malaves' statements inculpated Tovar in Christenson's murder, Tovar also raised the Confrontation Clause issues described earlier. In this context, the district court properly redacted the Malaves' statements so that only those statements

that were directly against the Malaves' penal interest were admitted. On appeal, Tovar argues that the court should have redacted his taped interview with the police as well.

■ We disagree. The same statements made by the police about what the Malaves told them in the taped interview are not hearsay. Hearsay is an out-of-court statement offered in evidence for the truth of the matter asserted. *See* Minn. R. Evid. 801(c). The prosecution argues that it did not offer the police's statements on the tape for their truth, but rather to give context to Tovar's responses and admissions on the tape. The district court ruled that providing such context was proper with respect to Sgt. Bohlig's testimony, through which the tape was admitted. Tovar's statements, while also made out of court, are excepted from the hearsay definition as party admissions. *See* Minn. R. Evid. 801(d)(2)(A). Because these statements are relevant and are not hearsay, the hearsay and Confrontation Clause issues raised in the context of Lt. Reed's testimony are simply not applicable here. *See generally* Minn. R. Evid. 402 (stating that unless otherwise excluded, all relevant evidence is admissible).

■ Additionally, we note that there may have been sound reasons of trial strategy for Tovar not to object to the tape, but rather allow this tape to be admitted in its entirety at trial. Tovar chose not to testify at trial. While Tovar's admissions on the tape implicated him in the events leading up to Christenson's death, the tape also contained numerous denials of his involvement in the killing, including his denials that he was even present during the murder. The tape also contains several of Tovar's statements of his concern for Christenson. These included statements that Tovar and Christenson were friends and explanations of why Tovar went with Christensen on the after-

noon of the murder. This taped interview was an alternative avenue to get these statements before the jury without risking cross-examination and possible impeachment. Trial counsel cannot have it both ways: failing to raise a specific objection at trial for its own reasons of trial strategy, then claiming the admission of such evidence as error on appeal. Absent clear and specific objections raised before the district court, we will generally not consider issues of the admissibility of evidence raised for the first time on appeal. *See* *State v. Patterson*, 587 N.W.2d 45, 52 (Minn.1998).

In this case, there was no plain error, and we hold that the district court did not abuse its discretion in admitting the taped interview. We see no compelling reasons to inquire further into this decision. *See* *generally Griller*, 583 N.W.2d at 740 (stating that before appellate court should engage in plain error analysis it must first detect an error "that is plain").

*Sufficiency of the Evidence on Kidnapping*

Tovar challenges the sufficiency of the evidence on the kidnapping charge and claims that the state produced insufficient evidence that a kidnapping occurred at either 293 Atwater or earlier at 918 DeSoto.

■ In analyzing a challenge to the sufficiency of the evidence supporting a conviction, we look at the record "to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict which they did." *State v. Webb*, 440 N.W.2d 426, 430 (Minn.1989). In doing so, "we must recognize that the jury is in the best position to evaluate" witness credibility and "assume that, after due consideration, the jurors believed the state's witnesses" and did not believe the defense's witnesses. *Profit*, 591 N.W.2d at 467.

■ A person is guilty of kidnapping if he confines a person, without the person's

consent, "To hold for ransom or reward for release, or as shield or hostage;" "To facilitate commission of any felony or flight thereafter;" "To commit great bodily harm or to terrorize the victim or another; or To hold in involuntary servitude." *See* Minn.Stat. § 609.25, subd. 1 (1998). There is no requirement that the person be detained for any particular length of time or transported any particular distance. *See State v. Morris*, 281 Minn. 119, 123–24, 160 N.W.2d 715, 718 (1968).

■ Tovar was charged with kidnapping Christenson with the intent to cause great bodily harm. The woman caller and Cleveland testified that Tovar and others bound Christenson's hands and face with packing tape. They also testified that Tovar and others carried Christenson into the house, beat him, threw him down a flight of stairs and then carried him out of the house and put him in the back seat of his car. The medical examiner's testimony indicates that Christenson was severely beaten, receiving a serious concussion, sexually assaulted and, finally, repeatedly stabbed with both a double-pointed instrument, possibly a cooking fork, and a single-edged knife. We conclude that there was sufficient evidence in this record to support the guilty verdict on kidnapping with intent to cause great bodily harm.

*Variance between Indictment and Proof*

■ Tovar also claims that the conviction of kidnapping cannot stand because there was a "fatal variance" between the indictment and the proof at trial. We find no merit in this argument. The state charged Tovar with kidnapping Christenson in Ramsey County, State of Minnesota for the purpose of causing great bodily harm. The jury found him guilty of the same charge. The evidence was sufficient to sustain that verdict.

Affirmed.